Good morning, your honors. Michael Cox on behalf of the appellate, Carlo Pederson. The issue before this case is whether the district court erred in degrading the defendant's motion for summary judgment and also in denying plaintiff's motion for partial summary judgment on the first search that we requested. I think the starting point in this... Isn't the second subpoenaed in the first? The second search? No, the second. Yeah, well, let me ask the question. What searches do you complain about? Both. There's two searches. I know. I know there's three visits and the dates are somewhat confused in your briefs. So I want to make sure I understand. You're talking about the 30th and 31st? There's the search on the 30th is the one where they say they entered the house the first time. My client says they entered the house the first time on the 29th. So there's a dispute, I think. Right, but there's only two searches. Only two searches. And the other side also says there's two searches, which is that your difference in the dates is immaterial. That's correct. That's correct. Yeah, there's three visits, and my client has them coming now. But there's no complaint about the visit? No. No? The actual entries into the house. Let's assume for a moment that the entry into the house by way of Fourth Amendment would make good arguments about why it may happen. How can we determine that that was clearly established law at the time? Given our decision in the cases they might get pronounced, or something like it, that at the time, child protective services or DHS agents were merely told by the agency, go get a kid, go into a house and get a kid. Here we have a court order. Now, that court order may be deficient. It may be a Fourth Amendment violation. I want to put that aside for a second. But if it's not clearly established that it's not unconstitutional at the time, simply to go on the basis of the agency's imprimatur and get the child, how can it be clearly established that it's unconstitutional to do it, but a court tells you to? Well, I would say that it has been clearly established, I think, in all the child welfare cases that we deal with. Let me ask you again with that very specific case. This court said, dealing with, actually, a pre-emptive slightly after the section of this case is difficult, that if the agency says, go pick up that child, and you do, and you enter a house to do so, that even if you're violating the constitutional rights of someone by doing it, it hasn't violated clearly established law. Well, this was before then. So how can we say that clearly established law was violated by somebody who, pursuant to a court order, did exactly the same thing that occurred in a horrific case? Well, I'll deal with it in two ways. One is I'll start with what I think is called CSRSET. Let me get a shot of that. I was going to say CSRSET. I thought you would pronounce that before I had to. But CSRSET is grounded in clearly established law. So when CSRSET says you can rely on the DHS officer who's on the scene telling you to go into that house, CSRSET says, you can't blindly follow that order. You still have to go within exigent circumstances. So there, if you read the court's opinion, they don't even have a court order there. They don't have a court order here. You do have a court order there. Right. If somebody's calling to remove some magistrate who's facing an order, at least what the district judge relied on was the Fifth Circuit's case in Warnakee, I think, suggesting that that was right. And if these officers had had a copy of Warnakee in their back pocket and the creditor had marked down how could they have violated it. We didn't violate the Fourth Amendment at all. We didn't even need qualifying. The key distinction is that Warnakee is saying that a court order is the equivalent of an arrest warrant. And an arrest warrant takes you down two different paths. The first path, the path that the district court inherently goes down in this case, is the Dayton path, where you're going to the house where the child resides and the parents reside. And there we know arrest warrants, or treating the court order as the equivalent of an arrest warrant, allows you to go into a house-and-act situation. So if they have Warnakee in their back pocket, they're thinking, okay, if this is the child's home, the parents' home, we can go into that with Warnakee. But we also know if you read Warnakee all the way through, and this is where the district court makes its error, Warnakee goes through and says there's two paths. There's Dayton. We're on the Dayton path. But there's this Gable path. This Gable path says arrest warrants don't allow you to go into third person's homes. So if they have Warnakee in their back pocket, they look at footnote 9 of Warnakee. They read it. It says, well, Stiegel applies here. Stiegel's clearly established 1981 U.S. Supreme Court case, where it says you don't get to go into third person's homes. You would have to be entitled to go into the home of the person you're arresting. You're entitled to go into the residence that the individual you're searching for. And what can you do when you're searching for a baby? Well, when you deal with a baby, you still have to look at that child's residence or the parents' residence. But that's part of the problem here. There was no residence we had. No, I think it was being moved around as far as I can tell. It's a shell game. It wasn't clear who was related to whom here. I mean, having those relationships here were pretty complicated. Yes, I understand. And so the interesting situation here, factually, is they go to the home where the child was residing with the maternal aunt, Kayla Horne, and apparently they see that she had moved out, that they saw her moving boxes. They don't even say she had moved out. They clearly knew that we're going to Peterson, because there's no reference in the record that Carla Peterson's home, my client's home, was the residence of the child, except for all the evidence that there were children's toys and diapers and other things at the home. That doesn't make it the residence of the child. They're looking for it. The diapers are seen later when the afternoon entry. The toys are seen before. I'm not sure this is a truthful case for you. They've got plenty of evidence that the child was, at some point, residing in this house. That may not be sufficient to satisfy the Fourth Amendment, but it's a different argument. I'm still stuck with, just pronounce the case for me again. Cersak. Cersak. Cersak. Cersak. I'm still stuck with that because if the boss at the agency said, this child is in danger, we're ordering you to go find them and pick them up, and that's what they did in that case. We said that's entitled to qualified immunity. Right. Here, they went to a neutral magistrate who said, made a determination that the child had to be picked up. He didn't say where. He didn't say where the house was, but somebody at the agency did exactly what they did in Cersak. Does that make a difference to you? Go to that house. I apologize for interrupting. If there had been an address, go to the aunt's house. Would that have made a difference in your case? No, I don't think so. I think that if it's bad, if they had a specific address, still no difference. Right, right. And I think that, you know, I want to get back to Cersak, because I do think it's an important question that you're asking, but Cersak is still grounded in a firm constitutional analog, and that's the exigent circumstances. No, I assume, but, you know, we're working backwards from a certain time, but we do know what kind of cases there are going to be in Cersak. So, but if somebody with Cersak is in their back pocket, it's a judgment I assume. Well, as you said, I don't even need a warrant here. I think that's a fruitful exercise, and so let's let them have Cersak in their back pocket, because Cersak goes through an analysis at the end to really say, this falls within basically a warrantless search. They don't have a court order, and it's such circumstances. But in the dangers of the trial there, it doesn't, I've never had an institutional behaviorist opinion, but I think I've read it down pretty carefully. He's very careful not to say, this is okay in the Constitution. He says, we're not, that's a hard question. I'm not going to deal with the legality of this. I'm just going to try to figure out whether a reasonable officer at the time would have known it was legal. And so the exigent circumstances stuff doesn't help me, because that's a constitutional analysis. So the question is, given the facts of that case, would an original person at the time say, I don't even need a court order. There's no agency that tells me to do it. Right. I've got immunity. Because in the facts of that case, you have a reliable tip from a doctor, involving drug use by the parents there. You have prior convictions of child endangerment of both parents. Either of these exist here. They confirm that they're at the children's residence, because they see the children through the door. We don't have that here. We have the existence of toys. Does it indicate that the child has been there? Does it indicate that particular child has been there? We have uncooperative parents. They're at the door refusing entry. Won't even let the DH person talk to the children. And we also have, this was a critical fact for Judge Gilman, and Sir said was. He said it was just guilt. He said that. Yeah. It was quite, so I think it was. Yeah. I just want to say. But I think the big fact was, there's no court available to get an order of warrant or anything from here. The Hoover Court is available. Right. The one supports that an order is issued from the officer's perspective, the job protective officer's perspective. He or she no longer needs to worry about whether there were exigent circumstances or probable cause or anything else. They've got that piece of paper from the middle magistrate. Now, you may be right that that piece of paper doesn't entitle them to go into a residence with their name on the piece of paper. I'm assuming that for the moment. But given the fact that with exigent circumstances, they must enter places. Why can't you bust into places with a warrant? Well, the warrant would be the equivalent of death pass and arrest with exigent circumstances. And it's the equivalent of an arrest warrant, which takes us into Stiglitz. And Stiglitz says, you don't get to go into third parties' homes with an arrest warrant absent going back and getting a search warrant. So a job protective order that doesn't have particularity or specificity. So I guess that comes back to your question a bit. That's one of those factors. It's not the equivalent of a search warrant. And Stegman, 1981 U.S. Supreme Court case, says the equivalent of an arrest warrant can only get you into the residence of a parent's house. It doesn't get you into a third person's house. I want to go back to that question. That was a 2-year-old. A 2-year-old who resides wherever they happen to sit at the moment. They don't know in front. I don't think that's ever been decided that way. That because there's a 2-year-old out there, we can still decide to prevent our parents out of a qualified community. Well, I think it has because I think all the child welfare cases have always fit into one of our well-established boxes. Whether you don't have a well-established box, the officer at a certain time is qualified to intervene. I don't think they are. And there are responsible friends of Stegman before I wander on that question. I think the question that was undecided is whether child protective custody orders are the equivalents of arrest warrants. But if you answer that question either way, an officer isn't going to know. That doesn't entitle you to go into third parties' homes. So I see the question differently. I mean, is this really a third party's residence if the child is residing there? In other words, if you're going to pick up the child and it's residence and the child happens to be residing there, you don't pay it temporarily. Isn't that a little bit different to the cases you've seen? I think it was evidence that the child is residing there. It could be a different case. But you've got to read the record carefully here. And I think it's important to really read the honest tip. The honest tip doesn't say the child is residing there. And then you have questions. The honest tip are Gates and Meyer and all those cases. Those are on the Fourth Amendment. Right. And what the person says is that they have left the child with Carla Peterson. It doesn't say that the child is then going to resign with Carla Peterson. There's not a shred of evidence in the record that says the child is going to either, as in Siegel, the child has left Carla Peterson. I mean, it's those two stories. We assume it shows that the child then was hurt two to four months and left alone. But when Ms. Peterson resides in a particular place, that's where we would expect to find the child, right? It doesn't say at any point of the text without any verification or at least we're sort of stuck with the idea that a child of this age is going to reside with whoever is her caretaker at the moment. And I don't think the record establishes that Ms. Peterson was her caretaker, other than, you know, and we've got this one. Again, it's difficult because it's not a credible tip that we're dealing with to try and establish residency for the child. And I think that's a threat to the person who owns the rights to have their home free from searches. But it doesn't establish residency because, as Siegel says, you can have overnight guests, you can have people staying for a short period of time at your house, and it doesn't make them a resident. So you go back to Siegel and the person they believe was staying at this home and now that they've established residency there, and there's nothing that indicates that the child would have established residency with Carla Peterson when they've never had possession of the child. I've looked at this record. I want to make sure I understand it. There is evidence that the child was in this house for some of the time period. Excuse me. I would disagree. I would say the presence of toys doesn't say that this particular child was in this house. Was there any other children in the house? Well, if we look at the right side, just tell me what the record demonstrates. Is there any evidence in the record that there were any other children in the house? The record doesn't demonstrate who the toys belonged to, correct? There's nothing in there that says that this particular child or image that the child is with was each. Right. And they told us their house one day in their inside connection. That they've been moved. So they show that the toys have been moved, but they don't show which child are placed with them, who the child is. There's no view through the window like in the suicide or the door. Any actual child is in the house they actually find. Right. So I don't believe there's sufficient evidence here to establish residency of the child at this home to allow the officers to go in. They would have to know that there's residency, whether the officers are sent in their back pocket or in a key in their back pocket. But they definitely should know about school, which states, you can't go into third parties' homes. Thank you, Your Honor. Thank you. May it please the Court, December, I'll come to you as the claimant, county sheriff, team manager, Megan Lee as deputy, Shane Mitchell. The Court already addressed many of the issues that I'm going to be talking about today, but very clearly, I think there's a lack of facilities to establish law directly on point. The issue is truly whether the officers were entitled to rely on the DHS protective order that was issued by two separate judges. In this case, as would not be clear to a reasonable officer, and you guys have already discussed the case, I'm going to call it a button just to avoid having any issue announcing it. In the button, the Court said that the officer in this situation would be stuck and attached to a two-situation. You either disregard the DHS and court order and subject yourself to discipline and potential child harm, or you disregard or you subject yourself to constitutional violation. If you think this order allows entry into homes, is that the effective equivalent of a juvenile warrant? Go find the child and enter wherever you want. I believe so, but what we're looking at here is what the officers knew and what the officers didn't know. I guess my question is, wasn't it clearly established at the time this order was issued that juvenile warrants were in supply and you could enter into any place to look for something? Correct, and it comes back to the reliance factor and the involvement of DHS and the court, because we're dealing with a very unique statutory scheme here. DHS has to submit certain statutory information to the court. There's no need or reliance to put on an actual address. DHS can do it. There's no need to do that to establish the case to take the child. Right. But you're using this piece of paper that says to take the child to enter into Ms. Peterson's home, right? Right. And that piece of paper doesn't identify Ms. Peterson's home. No, it does not. It identified it and it was standing there and appeared through a colleague's subjection, so I think this case would be over So what it appears to be is go find this child wherever you have to go and wherever you have to enter. It is true that way. And if it is true that way, wouldn't every reasonable officer know that courts can't allow you to do that? What the officers knew is that they're entitled to rely on DHS and the court order. What we have is CSRSF and Button that says they're entitled to rely on DHS given some objective factors that confirm what DHS is saying. DHS is saying that this child is in this house. And, in fact, as the court noted, this was for on-test purposes according to what the officers knew at the time of the child's residence. The child did not have a home. As the court in Wernicke stated, there's difficulty here with a highly mobile one-year-old child and his family effectively preventing access to him. There's also the reliance on the court's orders, which, as the courts did in Armstrong v. Asplen, when the court issues an order that authorizes some activity excepting the fact that it's a function of a parental warrant, you're entitled to rely on that. And that's the ultimate touchstone for saying that it is presumptively reasonable. Certainly there's a lack of an address, but there is no reason, no law and no statute or otherwise that would have required, in this circumstance, to have an address. Do you agree there was no order by DHS for finding that this child was in imminent danger? I mean, the fact that it took a while to get a court order to hopefully locate the child, there's nothing in the record, is there, to reflect emergency or emergency? I don't think the officers are allowed to look that far into it, and that's the problem that we're seeing here, is how far, let's say, did DHS make such a finding? Set aside the officers for a moment who are relying on DHS. There's nothing from DHS suggesting urgency or emergencies. I don't think there's anything in the record that establishes that. All we have is the court order that says that DHS must take immediate custody of the child, and that immediacy is something that the officers are entitled to take action on. Right. Can you do a gray area? The officers wouldn't be entitled to just go into every house in the neighborhood and look for the child. Correct. So what is it in this case that makes it reasonable, whether or not it makes it reasonable, what is it in this case that would suggest, and a reasonable officer would know that they just couldn't take this piece of paper and go into every house in the neighborhood, right? Right. So what is it that makes it, what is it that makes this case different, including in terms of Peter's case? Again, it goes back to the involvement of DHS as to how to target this, so it's difficult to discern or investigate. Well, what do these officers know that makes it at least clearly unthinkable for a man's decisions to enter this third party's house as opposed to entering my house looking for the child? Well, again, as far as they know, it's not a third party's house. Well, what do they know? Tell me what they know. They knew that the DHS, or the protective custody order, the Sector 1 authorized entry into the child's residence, and DHS, I believe it's the Declaration of Internal Homes that says, I informed the officers before they executed this warrant or protective order, however you want to view it, that this child was in this home. So they knew something about this particular home. Right. They knew that the DHS officer or official himself asked what the child is. What else did they know before they entered the home? So they knew that the child was there, they knew that the great aunt was, at some point, a custodian of the child. Yes, and that's based, again, on that same information from the DHS. So the same as if this was, they had information the child was there, that it was the residence of the great aunt, what else did they know? They had a previous visit to the house. Right. And what did they know from the previous visit? This goes into that CSR 7 button discussion. You can't blindly rely on information from DHS. I acknowledge that, as you guys already discussed, there must be some objective confirmation. So when they showed up, there were toys outside the house, and at that point in time, we may disagree on the case here. I think it's the 29th, but I suspect that the name of the date confused them. I assume it's the 29th. Perhaps. On the 29th, there were toys outside the residence, and there was enough information to say, okay, there is a child here, but there was no one to speak with. At that point, DHS, not the point of cash service, went back to the court and obtained this more specific protective order. And they go back on, should I say it's the 30th, before they enter the house on the 30th, what do they know? The additional stuff you told me, what did they learn on the 30th? At the time they arrived, I believe it's Deputy Dias, where he says the toys had been moved inside. He could see them? He could see them. Well, yeah, they were no longer outside. Previously, the children's toys had been moved, and he said that it appeared that people were home. So they knocked, and it was their entry, and they thought that perhaps the child was inside. So did he have any additional information on the 30th other than he had on the 29th by paying at the house? Did he see the toys inside, something else inside, and just the changing circumstances for the toys outside? I don't think it's established on the record whether they saw through and saw the TV on or anything like that. Okay. The TV is on the next floor. Right. So they enter on the 30th in the morning, and that is when they notice that the TV is on, there are diapers out. And this update is numbered after the search begins. I'm not sure about the TV, but certainly the diapers are on. But the toys having gone from outside to inside, it's apparent that somebody has been there in the previous 24 hours. Correct. Correct. And that's the information that they're aware of. And at that point, at the time that they made that entry on the 30th, they had this specific order that mandated pickup of the child immediately, and that law enforcement was authorized to enter the house as residents of the child. And they entered again on the 31st? Yes, in the early morning hours. What did they learn on the 30th, in addition to what you've already stated, that might lead them to have to leave on the 31st with a child like that? Again, once they entered the house, they saw the TV and the diapers, and the fact that someone had been there very recently didn't look like a child would have been there at the time, so they determined that they needed to come back. Because they had made two searches or two arrivals during the daytime, they came in at a different hour in order to ensure this. Could they have gone back to the magistrate, the judge, between these various businesses and said, we have more information, and we'd like you to authorize us to enter this house as opposed to just authorize us to register the child? I think they certainly could have. But again, there was no clearly established law that would have led them to believe they needed to do that when DHS was wanted to perform the investigation, submitted the information to the court. Two separate judges had reviewed these affidavits, proved the second one, provided that they were allowed to enter the residence of the child for the purposes of the officer's knowledge, not the child's residence. Can you conceive of any circumstance where they would be required to go back or are they required to blindly accept the DHS order? They're not entitled to blindly accept it if the court established that. But there are circumstances, and I think the court spoke to that, when the officers are intimately involved in the activity, when they're either performing the investigation or if they're involved in the planning or the execution. As Button said, these officers didn't make any independent determinations in order to gain the protective custody order or to execute it. They were simply there to assist. And I think that's where the law stands currently. I think also accepting the fact that Leah's argument that Stigold says that overnight visits, I simply don't think that law applies in this context where you're dealing with child protective custody orders. What is the order the equivalent of? Well, in this circumstance, I'll tell you that there were two orders. The first order appears to be more akin to an arrest order instead of a basic arrest order. And DHS felt it necessary to go back to the court and obtain a second order that allowed access into the house. Which is more akin to a search order, I believe. So in the difficulty with viewing it as a search order, it seems to me, is that it doesn't specifically identify the premises to be searched. That's correct. And there was no statutory requirement for doing so. And again, we're looking at what DHS did. But surely if it was a search order, there was a law established on a situational requirement. That's correct. Updated device. That's it. So why isn't this law clearly established that viewing this as a search order, this search was unconstitutional? Well, first of all, the law at the time said that if you're entering the child's residence, there's no need for an additional warrant. The arrest warrant functions officially to enter the child's residence. Second of all, we're allowed to have deference to DHS in obtaining the information needed. A facially valid and protective custody order, based on our enthusiasm, allows them to defer to the court as far as what's necessary. Because all that we have in obtaining these protective custody orders are conversations between the court and DHS. And to the extent we're requiring the sheriff's office to stick their nose into that process, come back to the court and give them specific information, they're subjecting themselves to liability. And we're putting them into the process where they're otherwise entitled to stay out. Does Harper contain any evidence of any other location where the child might have been? Well, yes. In the original affidavit that DHS submitted, they noted the father's residence that may have was residing here with the child. And as noted in the record, DHS went to that address and it appeared that he was born and the child had moved out. The neighbors had informed them that she had moved out. And the father, who was in jail, cursory, they spoke with him and he said he did not know where they were. The mother was unavailable, so there were no other addresses that were available to them. I will reserve the remainder of my time. Thank you. Well, there may be another where you're going to take it. That's all. You're going to be a good senator and make it easier to send your opponents. Thank you. Mr. Clark. Mr. Cox, I'll forward you a minute for a moment. The record reflects that DHS didn't do a whole lot to locate this child. There may be one attempt to go to the address where and it doesn't even state the date where they made the attempt to go to the address to find the child there. The incident that caused the domestic violence happens on August 7th. And all the searching has taken place on the 26th, 29th, and 33rd. I understand, but there really weren't any other realistic alternatives given what the father said and did, where he was located, and what they knew. It was a logical place for the child to be. No efforts to call Ms. Peterson, no efforts to call Ms. Horn, to open the door of the home and try nobody would answer. The underlying situation is that on the 29th, the date Ms. Horn says, I mean, my client, Ms. Peterson, says the search took place. Ms. Peterson had Ms. Horner down at the courthouse where the DA sees them and knows they're there. And so officials in Clarkmouth County, they're not hiding. They're out there in public right in front of officials in Clarkmouth County. And so, you know, what should, in your view, the officers, state agents, county people, what should they have done in this case to comply with the Constitution? I think they should have either called my client, waited until she arrived at home, contacted her some way, somehow. She's an individual. But, you know, the issue is that they can make a search warrant. If they feel they have enough. I don't think they have enough to get a search warrant, but they can go to the mutual magistrate and get a search warrant. They had a search warrant. If they had a warrant, it may be an effective search warrant, but they had a search warrant. So taking your position has to be when they obtained that warrant, did you put your client in trouble? There's no case anywhere that I found where a child's protective custody order has been treated as equivalent of a search warrant. Now we're back to what Judge Ivey said. I don't know if this is related to your argument, but Judge Ivey said, there's no case anywhere you're in trouble. No, not necessarily. I don't think you get to expand the law on new and novel questions and avoid the clearly established precedents of exigent circumstances and how arrest warrants work because you now come up with a new argument. I think the officers on the scene know that, hey, this has to fall into one of our boxes, that they've been trained in it. It's so pleasant. And I think that was the case here. I'm sorry. The only thing I did want to do was I was going to read the paragraph regarding the tip, the anonymous tip, because I think it's so vague and so unreliable that I don't think anyone could have established that this was the residence of a child. It would be the fault of the officers that put it. What's that? It would be the fault of the officers who put it. It might be relevant to a question of suppression of evidence. There were criminal charges here, but the officers are not responsible for knowing the basis of the order. They're not the ones who saw it. They're after the evidence. They're the ones who told the evidence. The statement is what the DHS officer specifically tells the officers about where the child is. Yeah, her statement as to why she believes the child is there. She says in her affidavit, this is specifically what I told the officers. The full paragraph says, also prior to August 30, 2011 entry, I explained to Deputy Diaz and Sergeant Huntsman where I believe the child was with Carla Peterson at her house on 755. It gives the address. It explains why she thought it was there, but here's the specific information she gives them. Specifically, I explained to Deputy Diaz and Sergeant Huntsman that I had recently been contacted by a person who she doesn't identify, so it's confidential or anonymous, who knows Ms. Horne well and that this person informed me that Ms. Horne had told the person, so they have Ms. Horne telling somebody, that Ms. Horne left the child with Carla Peterson. Period. Not that she had turned her over for a residency. Not that she's turned over care to her. Not that she's, this is a reasonable difference. Again, we have such a complicated family situation. It's not like anybody's going to be responsible for this child. And we now have a DHS expert, a DHS trained person, one of the officers is flummoxing. I don't know why the officer is so responsible for questioning her. And that is, you have to live with the circumstances of what they're told. Yeah, and even under your client's view, I think, it's pretty critical to have the wrong data. If they go in on the 29th, before they go into the 29th, there's a choice of being here. That's correct. So they've not just arrived at the DHS office and they've gone out and done some identification and there's a child there. It may not be enough, but they have to know that. But yeah, there's evidence that there's a child there, and I'm way beyond the time, but I did want to, my client, I don't think it's clearly wrong on the 29th, because my client didn't tell it to a specific event. She says she's down at the courthouse, and she comes back and finds it at her house. And I know it's an assumed instance, but it doesn't make any difference. We have the data at the courthouse, it's the 29th, so it could be that the officers are wrong on the 30th, or that they went in the second time on the 30th, but didn't get any evidence, or my client thought they went in the second time, so there may have been a third search. We don't know about it. So I don't think my client is clearly wrong on the 29th, and I don't think that's really the impact of the decision one way or the other. Okay, thank you. I'd like to thank both counsels for the argument that Patterson v. Monmouth County has submitted the last calendar, or the last case on the oral part of the calendar. It's Plano Forestry Insurance v. Willowwood.
judges: Bybee, Hurwitz, Zouhary